FILED - USDC -NH
2022 JAN 31 11:31

1

2

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

3

4

FARVA JAFRI, an individual,

Case No.

Plaintiff,

5

COMPLAINT FOR INJUNCTIVE RELIEF AND
DAMAGES

vs.

6

7

8

9

10

11

12

13

14

NEW HAMPSHIRE SUPREME COURT
COMMITTEE ON CHARACTER AND
FITNESS, NEW HAMPSHIRE SUPREME
COURT OFFICE OF BAR ADMISSIONS,
SHERRY HIEBER, In her individual and
official capacity, JOSEPH F. MCDOWELL,
III, In his individual and official capacity,
TIMOTHY GUDAS, In his individual and
official capacity, PETER G. BEESON, In his
individual and official capacity, THOMAS E.
BLONSKI, In his individual and official
capacity, ROSE M. CULVER, In her
individual and official capacity, SUSAN
FISCHER DAVIS, M.D., In his individual
and official capacity, and RYAN GUPTILL,
In his individual and official capacity.

JURY TRIAL DEMANDED

15

Defendants.

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff, Farva Jafri ("Plaintiff" or "Jafri") hereby brings this Complaint *pro se* under 42 U.S.C. § 1983 for damages resulting from the Deprivation of Civil Rights and other claims inflicted upon Plaintiff by Defendants. She alleges the following upon information and belief as to all other matters:

## BACKGROUND AND NATURE OF THE CLAIMS

1.  "Live free or die" is the official motto of New Hampshire. But, if you are a member of the New Hampshire Supreme Court Committee of Character and Fitness or New Hampshire Supreme Court Office of Bar Admissions (collectively referred to as the "Committee"), that motto only applies to you if you are White.

2.  New Hampshire has a population of 1,388,992 and is one of the smallest states in the United States of America, ranking 42nd in terms of size, with a whopping 89.8% of its residents being White[1]. This level of "Whiteness" stands at 29 percentage points above the nation's percentage of white residents[2]. This statistic alone makes New Hampshire one of the least diverse states in the United States of America.[3]

3.  Prior to the lynching of George Floyd[4], racism was a mere blip on the map in the United States, racism was a mere blip on the map in the United States. Many brown and black men and women had been subjected to the throes of institutional racism, police brutality, and subtle discrimination for decades. The latest rise in hate crimes against members of the AAPI community[5] is just another indication of White Supremacy and privilege, and structural, yet systematic, discrimination of all people of color at all levels of government in America.

4.  On May 31, 2020, Dahleen Glanton of the Chicago Tribune published the article, "White

---

[1] https://www.census.gov/quickfacts/NH
[2] https://www.census.gov/quickfacts/fact/table/US/PST045221
[3] https://www.masslive.com/news/2021/09/three-new-england-states-among-the-least-diverse-in-the-nation.html#:~:text=The%20states%20with%20the%20least%20overall%20diversity%20are%20West%20Virginia,the%20state%20with%20the%20lowest.
[4] https://www.opendemocracy.net/en/opendemocracyuk/george-floyd-was-lynched/
[5] https://spectrumnews1.com/ca/la-west/public-safety/2021/07/02/facing-increase-in-anti-aapi-hate-crimes--asian-women-learn-self-defense-

America, if you want to know who's responsible for racism, look in the mirror." As Ms. Glanton

poignantly notes about a White person's reaction to racism,

> But somehow, white people always find a way to get over it. You post your angst on social media to show which side you're on. And while the stories make their way through the news cycle, you and your friends lament how awful racism is. *But you are wrong.* ***White people, you are the problem.*** *Regardless of how much you say you detest racism, you are the sole reason it has flourished for centuries. And you are the only ones who can stop it.*[6]

5. Institutional racism and white privilege have long been problems in the United States. A Google search of "institutional racism in the US" yields 43.2 million results, with political parties putting the issue at the top of their agendas.[7]

6. The Transnational Racial Justice Initiative published a report in March 2001 titled, "The Persistence of White Privilege and Institutional Racism in US Policy."[8] This report, written over twenty years ago, consists of the same issues people of color ("POCs") face in 2022. Until the 1940s, towns and cities incorporated explicit instructions restricting non-Whites from living in their municipalities. *Id.* at ¶ 199. Municipalities were eventually restricted from enforcing these policies explicitly, so towns and cities crafted new ways to keep POCs out of their communities – through restrictions that kept affordable housing out of their communities, thereby excluding low-income POCs. *Id.* Exclusionary land use has been driven by racial animus, and in some instances, is now worse than it ever has been. *Id.* at ¶¶ 201-205. Of course, this is why New Hampshire is as White as it is, and proud of it.

Hassan Kanu of Reuters describes the legal profession as "exclusionary and classist," and notes that data shows that diversity among lawyers has regressed in the last decade.[9] The culture and make-up of the legal profession is "often plain unwelcoming to people of color." *Id.* With a mere 3,523

---

[6] https://www.chicagotribune.com/columns/dahleen-glanton/ct-racism-white-people-george-floyd-20200531-tmdbj52ownc7fegdargh75k4qq-story.html
[7] https://www.washingtonpost.com/politics/new-deal-law-racism/2021/06/11/bd3a2612-ca2c-11eb-93fa-9053a95eb9f2_story.html
[8] https://raceforward.org/sites/default/files/pdf/303pdf.pdf.
[9] https://www.reuters.com/legal/legalindustry/exclusionary-classist-why-legal-profession-is-getting-whiter-2021-08-10/

lawyers who are members of the New Hampshire bar[10] and very little diversity[11], the Committee is the "poster child" of structural racism in the legal profession.

7.   Racism and bigotry are not mere catch-phrases anymore or things that are spoken about only when we hear about physical attacks against Asians, police brutality against Blacks, harassment of Hispanics at the border, or the implementation of Muslim bans by former presidents.  The Biden Administration lists racial equality as an *immediate* priority.[12]  The CDC Director declared racism as a "serious public health crisis."[13]  States, cities and medical societies have followed suit in declaring racism a serious public health crisis.[14]  Though Islam is a religion, not a race, Islamophobia is more prevalent than not in the United States.  Fifty-two percent of Americans state that they do not have respect for Muslims.[15]

8.   Unfortunately, the racist and bigoted actions (under color of law, apparent authority and official position in admitting lawyers to the New Hampshire bar) of Sherry Hieber, Joseph F. McDowell, III, Timothy Gudas, Peter G. Beeson, Thomas E. Blonski, Rose M. Culver, Susan Fischer Davis, M.D. and Ryan Guptill, all White individuals who work for the Committee, are part of a pattern of discrimination perhaps all institutionally racist, White-dominant states and their respective agencies engage in – especially in states that maintain over 89% of white dominance.

9.   This action seeks declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendants' unlawful and racist practices, in violation of 42 U.S.C. Section 1983.

### JURISDICTION AND VENUE

10. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action involves federal questions regarding the government's deprivation of Plaintiff's rights under 42 U.S.C. § 1983.

---

[10] https://www.ilawyermarketing.com/lawyer-population-state/
[11] https://www.nhbar.org/raising-the-bar-on-diversity/
[12] https://www.whitehouse.gov/priorities/
[13] https://www.npr.org/2021/04/08/985524494/cdc-director-declares-racism-a-serious-public-health-threat
[14] https://www.nhms.org/News/Presidents-Blogs/ArtMID/123866/ArticleID/585/Racism-is-a-Public-Health-Crisis
[15] https://news.gallup.com/poll/157082/islamophobia-understanding-anti-muslim-sentiment-west.aspx

11. Pursuant to 28 U.S.C. § 1391 and 29 U.S.C. § 1132(e), venue is proper in this district because a substantial part of the events or omissions giving rise to this action, including the unlawful discriminatory practices alleged herein, occurred in this district.

## PARTIES

12. Plaintiff, Farva Jafri, is a Muslim, dual Pakistani and American citizen, of Pakistani ethnicity and Asian race.  She is a self-employed attorney and an individual who is a resident of the State of New York.

13. Defendant, New Hampshire Supreme Court Committee on Character and Fitness, is a committee and government entity located in the state of New Hampshire.

14. Defendant, New Hampshire Supreme Court Office of Bar Admissions, is a government entity that is  located in the state of New Hampshire.

15. Defendant Sherry Hieber is the White general counsel for the New Hampshire Supreme Court Office of Bar Admissions.  She resides in New Hampshire.  Defendant Hieber was acting under color of state law for the New Hampshire Supreme Court Office of Bar Admissions at all times material.

16. Defendant Joseph F. McDowell, III is the White chairman, attorney and a "third generation Manchester, NH native"[16] of the New Hampshire Supreme Court Committee on Character and Fitness. He resides in New Hampshire.  Defendant McDowell was acting under color of state law for the New Hampshire Supreme Court Committee on Character and Fitness at all times material.

17. Defendant Timothy Gudas is a White attorney and the Clerk of the New Hampshire Supreme Court and a member of the New Hampshire Supreme Court Committee on Character and Fitness.  He resides in New Hampshire.  Defendant Gudas was acting under color of state law for the New Hampshire Supreme Court Committee on Character and Fitness at all times material.

18. Defendant Peter G. Beeson is a White attorney who is a member of the New Hampshire Supreme Court Committee on Character and Fitness.  He resides in New Hampshire.  Defendant Gudas was acting under color of state law for the New Hampshire Supreme Court Committee on Character and Fitness at all times material.

[16] https://www.mcdowell-morrissette.com/attorney/mcdowell-joseph-f-iii/

4

19. Defendant Thomas E. Blonski is a White individual who is a member of the New Hampshire Supreme Court Committee on Character and Fitness (with no law degree listed in his LinkedIn or other biographies).  He resides in New Hampshire.  Defendant Blonski was acting under color of state law for the New Hampshire Supreme Court Committee on Character and Fitness at all times material.

20. Defendant Rose M. Culver is a White individual who is an attorney, real estate broker and member of the New Hampshire Supreme Court Committee on Character and Fitness.  She resides in New Hampshire.  Defendant Culver was acting under color of state law for the New Hampshire Supreme Court Committee on Character and Fitness at all times material.

21. Defendant Susan Fischer Davis, M.D. is a White individual who is a physician (not a lawyer), and  member of the New Hampshire Supreme Court Committee on Character and Fitness.  She resides in New Hampshire.  Defendant Davis was acting under color of state law for the New Hampshire Supreme Court Committee on Character and Fitness at all times material.

22. Defendant Ryan Guptill is a White individual, staff attorney at the New Hampshire Judicial Branch, and member of the New Hampshire Supreme Court Committee on Character and Fitness.  He resides in New Hampshire.  Defendant Guptill was acting under color of state law for the New Hampshire Supreme Court Committee on Character and Fitness at all times material.

## **FACTUAL BACKGROUND**

23. Plaintiff is a licensed attorney admitted to practice law in the following jurisdictions:

  a.  New York (admitted in 2019)

  b.  New Jersey (admitted in 2020)

  c.  Illinois (admitted in 2020)

  d.  Massachusetts (admitted in 2021)

  e.  Maine (admitted in 2021)

  f.  Internal Revenue Service (admitted in 2020)

  g.  Social Security Administration (admitted in 2020)

  h.  The US District Court for the Northern District of Ohio (admitted in 2021)

  i.  The US District Court for the Northern District of Illinois (admitted in 2020)

  j.  The US District Court for the District of District of Columbia (admitted in 2020)

k.  The US District Court for the District of New Jersey (admitted in 2020)

l.  The US District Court for the Southern District of New York (admitted in 2020)

m. The US District Court for the Eastern District of New York (admitted in 2021)

n.  The US District Court for the Northern District of New York (admitted in 2021)

o.  The United States Court of Appeals for the Second Circuit (admitted in 2021)

p.  The United States Court of Appeals for the Seventh Circuit (admitted in 2021)

Jafri is in good standing in all sixteen (16) of these jurisdictions.

24. Jafri graduated law school in 2015 and initially did not practice law upon graduation. She joined several start-up companies and dabbled in the world of litigation finance (i.e., consumer legal funding) for a short period of time.

25. In 2018, Jafri was diagnosed with a brain tumor and after making a recovery, she pivoted to practicing law. She had worked for the Innocence Project for four years during law school and afterwards as a volunteer, and wanted to build a career and lifestyle of serving indigent clients who had limited access to the justice system.

26. In February 2019, Jafri took the Uniform Bar Examination ("UBE") in the state of New York. She passed that bar exam. Several months later, she interviewed with a member of the Character and Fitness Committee, which is required in New York, and was immediately recommended for admission. She was officially sworn in as a lawyer in December 2019.

27. Jafri then applied for admission, with her UBE score, in several other states, including Illinois and New Jersey, in 2020. Within two months of submitting her application for admission to the New Jersey Bar, the New Jersey Bar recommended Jafri for admission to practice law. Jafri interviewed with a member of the Committee on Character and Fitness in Illinois during the summer of 2020. After the interview, she was immediately recommended for admission to the Illinois Bar.

28. In 2021, Jafri was admitted to practice in Massachusetts. She was not interviewed by any member of their Character and Fitness Committee. In 2021, Jafri was also admitted to practice in Maine. She was not interviewed by any member of their Character and Fitness Committee, but she was required (like all lawyers in Maine) to find a sponsoring attorney who could vouch for her. Jafri's

law school classmate vouched for Jafri at the admissions ceremony before a judge in Maine, and she was admitted right away.

29. In late 2020, Jafri applied for admission to the New Hampshire Bar. On January 25, 2021, Defendant Hieber sent an e-mail to Jafri stating, "Also, your application is missing a photo, which is required. You may take a photo of your license and scan and email it, provided it shows a clear picture of your face." Exhibit A, Email from Defendant Hieber to Farva Jafri, 1/25/21. On the same day, Jafri responded with two forms of ID – her passport and driver's license. Exhibit B, Email from Jafri to Defendant Hieber. Jafri is Muslim, and for a substantial part of her life, she wore the Muslim *hijab*, which is a headscarf that female adherents of the Islamic faith wear. Jafri's driver's license photo is a photograph of Jafri wearing the *hijab*. After Jafri sent Defendant Hieber a photo of Jafri's license, wearing the *hijab*, Defendant Hieber ceased communication with Jafri.

30. Jafri complied with all aspects of the New Hampshire Bar admissions process. She disclosed all relevant information related to any litigation she has been party to, all evidence of moving violations, certificates of good standing from other jurisdictions and personal and professional references.

31. On February 4, 2021, Defendant Hieber sent Jafri a letter, demanding to know what Jafri's ties "internationally" were. On February 20, 2021, Jafri explained to Defendant Hieber via email that Jafri was of Pakistani heritage and well-known in Pakistan as an American lawyer. Jafri received no response to that letter.

32. On April 22, 2021, Lyne Schwarzer, a legal assistant for the Committee e-mailed Jafri a "Notice of Personal Interview" from Sherry Hieber. Exhibit C, Email from Lyne Schwarzer. Jafri had been through this process multiple times with multiple Committees on Character and Fitness. She responded to Ms. Schwarzer's e-mail within six minutes, stating, "I am available on this date and time. Please send me the Zoom information at your convenience." Exhibit D, Email from Farva Jafri to Lyne Schwarzer.

33. The letter stated, "I will communicate with you by email regarding the logistics of the interview on Zoom." Exhibit C. The letter goes on to state, "The Committee wishes to discuss information related to your response to question 7 regarding civil litigation." *Id.*

34. At 9:35 AM EST on May 4, 2021, Defendant Hieber sent a text message (not an email) to Jafri, referring to Jafri as "Favra" rather than her proper name, an obvious sign of white supremacy, hostility and disrespect toward Jafri, an Asian and Muslim individual.

35. Jafri appeared on Zoom at approximately 10:50 AM EST on May 4, 2021.  Despite Jafri going through multiple character and fitness interviews in the past, she did not expect a sea of white individuals to appear on the Zoom screen, who looked and talked nothing like Jafri or the clients that Jafri represents.  Jafri was the only POC in the entire Zoom room.  Including Defendant Hieber and Ms. Schwarzer, there were *nine White individuals* with whom Jafri was meeting for this so-called "interview."  Jafri, in several previous character and fitness interviews, met with one person for the admissions process.  Jafri was never notified that nine people would be attending what Jafri thought would be a routine interview that Jafri had been through several times before.  Had Jafri been provided with proper notice, Jafri could have obtained counsel.

36. Despite a critical need for lawyers in New England states with waning and aging populations[17], New Hampshire prioritizes its desire to remain White over the needs of its indigent citizens who would need Jafri's services.

37. When Jafri appeared on Zoom, Defendant McDowell (an attorney who prides himself on coming from a family in New Hampshire that has been there for several generations, contributing to its so-called "purity" and "Whiteness") unreasonably and immediately told Jafri that she needed to give the Committee a full presentation on her character and fitness, and that it was her burden to prove to the Committee that she was fit to be admitted to the New Hampshire Bar. *Nowhere* in Defendant's letter dated April 22, 2021 was Jafri instructed to prepare a presentation to the New Hampshire Supreme Court Committee on Character and Fitness.  Defendants did not tell Jafri to prepare any presentation intentionally, maliciously and recklessly, with the intent to embarrass and exclude Jafri from the legal profession in New Hampshire because she is Asian and Muslim.  Defendants further did this because they hope to keep New Hampshire's bar as "white" and "Judeo-Christian" as possible and

---

[17] https://dailyyonder.com/analysis-rural-new-england-crisis-legal-representation/2019/05/28/

1  exclude as many non-Whites and Muslims from their bar as they can, by tricking and embarrassing
2  attorneys who look like Jafri.

3  38. Jafri, who was not prepared to give a presentation, solely relied on what was referenced in
4  Defendant Hieber's letter: questions about litigation.

5  39. Jafri and her former employer are in pitched battles in state and federal courts in Illinois, and
6  have been since 2017, well before Jafri ever became a licensed lawyer.  Jafri has sued her employer
7  under the Equal Pay Act and for indemnification, and her former employer has sued Jafri for alleged
8  breach of fiduciary duty and theft of trade secrets (the "Trade Secret Matter").  Jafri left her former
9  employer because of her former boss's involvement in the drug trade and the hostile work environment
10  that comes with the territory of being employed by a drug kingpin.  Jafri's former boss, who is suing
11  her in the Trade Secret Matter, was a drug kingpin in South Florida and was sentenced to 15 years of
12  probation for trafficking cocaine.[18]  Jafri's former employer is also being sued by a slew of ex-
13  employees and investors with similar claims as Jafri[19], and by former customers for plying those
14  vulnerable customers with heroin and cocaine, such that said customers unconsciously sold their
15  annuities.  See *Lori Goney et al. v. SuttonParkCapital et al.*, (Case 1:20-cv-05387-AKH, July 2020).

16  40. Jafri provided information, on the fly, in presentation format to the Committee.  Jafri has been
17  involved in business litigation, between two competitors, in a saturated industry where competitors
18  regularly sue each other for claims of theft of trade secret and breach of fiduciary duty.  It is such a
19  common type of lawsuit within the litigation finance industry, that the competitor that sued Jafri and 11
20  other defendants had been sued for the *same exact causes of action.*  As an expert witness in the Trade
21  Secret Matter aptly stated, "It is common, unfortunately, for a company in this industry....to sue former
22  employees from whom they mistakenly did not  secure non-compete agreements under the false
23  pretense of trade secret theft."  Jafri, who explained this to several Committees on Character and
24  Fitness multiple times before, was not aware that Defendants in this matter would target her and use

---

[18] https://www.redandblack.com/news/alabama-man-indicted-faces-murder-charges/article_473a3734-9de4-5e78-a6f5-d84d6c421edd.html
[19] https://www.theglobeandmail.com/business/article-flying-high-flair-airlines-is-expanding-rapidly-but-internal-discord/

the Trade Secret Matter as a pretense to keep her out of the New Hampshire Bar, and keep the Bar as white as possible[20].

41. Defendant Beeson mocked Jafri on several occasions and told her that the other states in which she was admitted should have only given her a conditional acceptance to practice in their states. Defendant Beeson stated this to discourage Jafri, a POC and Muslim, from practicing in New Hampshire and in order to keep New Hampshire's bar as White as possible.

42. Defendant Davis instructed Jafri to read off the response she had emailed to Defendant Hieber previously on February 20, 2021, which was already part of Jafri's admission application, to the entire Committee on Character and Fitness. Defendant Davis wanted the entire Committee to hear that Jafri was of Pakistani descent and understand that she was Muslim, and not "one of them." Defendant Davis did this to embarrass Jafri and discourage Jafri from attempting to join the bar.

43. The Committee asked Jafri if she was going to be deposed in the Trade Secret Matter. Jafri told them that she would be deposed, but that there was a protective order in the case which placed an obligation on recipients of discovery material. Jafri, her co-defendants and her adversaries all had to have their expert witnesses sign protective orders to receive any discovery materials in the Trade Secret Matter. Jafri disclosed this to the Committee during her interview, and told the Committee members that if they wanted a copy of her deposition, which she would provide, they would likely first need to sign the protective order.

44. At 12:39 PM EST, Defendant Hieber emailed Jafri and told her that the Committee, including herself, Defendant McDowell, Defendant Gudas, Defendant Beeson, Defendant Blonski, Defendant Culver, Defendant Davis and Defendant Guptill, required a copy of Jafri's deposition transcript and would not consider her admission to the New Hampshire Bar until she produced a copy of her deposition transcript.

45. Jafri, bewildered by the obvious and targeted racism at the hands of the Committee, with their

---

[20] Jafri was recommended for admission in another, sixth state after being interviewed: Rhode Island. The interviewer, a sole individual, was thrilled to welcome a "diverse" member of the bar who could bring her life experiences to a small state where few lawyers choose to practice. This contrasts a New England neighbor, New Hampshire, a state that hopes to keep POCs and Muslims permanently out of its bar.

clear intent to exclude Jafri from the bar of New Hampshire, contacted a lawyer who specialized in admissions to various bars.

46. The attorney who Jafri contacted (who has been advising on admissions to attorneys for two decades) was equally distraught by the bizarre and racist practices employed by the Committee. First, he found it out of the ordinary and unprofessional that the general counsel of the Committee, Defendant Hieber, was texting Jafri from Defendant Hieber's personal cell phone. To an outsider (i.e., the attorney who Jafri hired), the text messaging from the general counsel's personal cell phone demonstrated that the process for admission was informal, however, the interview itself was nothing but informal. Next, he found it out of the ordinary that the Committee demanded expensive discovery materials from Jafri that were covered by a protective order. Finally, he found it incredulous that the Committee was clearly attempting to keep Jafri out of the New Hampshire Bar, when she was a member in good standing with and admitted in over a dozen other courts, agencies, and states.

47. After she obtained advice from counsel and sought counsel on the protective order that is in effect in the Trade Secret Matter, Jafri contacted Defendant Hieber on July 5, 2021 and told her that she was able to provide the deposition transcript, but the Committee would need to sign the protective order so that Jafri would not face sanctions or disciplinary action from the Court in the Trade Secret Matter. The Trade Secret Matter has been long and contentious litigation with two plaintiffs and twelve defendants, spanning five years. Jafri did not and still does not want to risk a sanctions motion or any discipline from the Court, and all other recipients of discovery materials have had no issue signing the protective order. Exhibit E, Email from Jafri to Defendant Hieber.

48. Of course, Defendants knew that Jafri would face a significant dilemma in providing a copy of the deposition without obtaining signed protective orders, and would lead to Jafri either facing sanctions or discipline from the Court, or could force Jafri to withdraw her application to the New Hampshire Bar. Defendants, in their targeted racism and discrimination against Jafri, were happy with either potential outcome.

49. Jafri also disclosed to Defendant Hieber in her letter dated July 5, 2021 that she faced financial burden and purchasing a transcript would be cost-prohibitive. Jafri's financial situation, which Defendants are aware of, is dismal at best. In Jafri's pursuit of claims against her former employer for

indemnification, Judge Gamrath in the Circuit Court of Cook County granted Jafri a full fee waiver due to her poor financial situation. Exhibit F, Order by Judge Gamrath. Moreover, Jafri has student loan debt in excess of $500,000.

50. After Jafri sent Defendant Hieber an e-mail on July 5, 2021, Defendant Hieber did not respond. On November 16, 2021, Jafri sent a follow-up email to Defendant Hieber and stated, "I have not heard back from you. If you have any follow-up, can you please reply here?" Exhibit G, Email to Sherry Hieber Dated 11/16/21.

51. Defendant Hieber did not respond. Instead, Defendant Hieber's legal assistant sent Jafri an email stating, "Sherry asked me to follow up regarding your email to her today. Sherry sent you a letter on October 22, 2021 following up with you after the committee meeting. Please see attached." Exhibit H, Email from Lyne Schwarzer to Farva Jafri.

52. Jafri had never received any letter from Defendant Hieber, and upon information and belief, Defendant Hieber never sent Jafri any correspondence via mail. Jafri responded to Ms. Schwarzer and stated, "Thanks, Lyne. The letter you have attached doesn't respond to the email I sent to Ms. Hieber. I had attached a protective order that needs to be signed to provide the information required. If you send me back the signed PO, I will send over the deposition transcript." Exhibit I, Email from Jafri to Ms. Schwarzer.

53. On November 17, 2021, Defendant Hieber finally responded to Jafri. Defendant Hieber stated:

> The committee reviewed the documents that you provided in your July 5, 2021 email at its July meeting, and sent you a letter dated July 15, 2021 in response. It is clear from that letter that the committee expected you to do what was necessary to provide a copy of your deposition transcript. You have not provided any documentation that the deposition testimony is still considered confidential, nor that you have sought permission from the court to disclose the transcript to the NH Character and Fitness Committee. The committee, and this office, will not sign a protective order. It is your responsibility to obtain and provide this information, and, absent a court order prohibiting you from doing so, the committee expects you to comply.

Exhibit J, Email from Defendant Hieber to Farva Jafri. Defendant Hieber gave *zero* reason or justification for not signing the protective order, putting Jafri in a tenuous position. If Jafri were to send

over the deposition transcript, she could face sanctions or discipline from the Court in the Trade Secret Matter. If Jafri sought permission from the court in the Trade Secret Matter to disclose the transcript, Jafri would be at the mercy of her former employer, whose owner is a renowned drug kingpin and with whom she is in contentious litigation with. Her former employer would likely cause problems for Jafri and attempt to intervene in the New Hampshire Bar admission process, to Jafri's detriment.

54. On the other hand, Jafri could easily just turn over the deposition transcript without seeking permission from the Court in the Trade Secret Matter or requiring the involvement of adversaries in that matter, if Defendants were to just sign the protective order, as many others have done before.

55. Defendants refuse to make this process straightforward because of their ulterior motive – keep non-Whites and Muslims out of the pristinely White, New Hampshire Bar.

56. In response to Defendant Hieber's e-mail on November 17, 2021, Jafri asked Defendant Hieber to, "please email me a copy of the July 15th letter that you sent." Exhibit K, Email from Jafri to Defendant Hieber. Upon information and belief, Defendant Hieber never actually mailed Jafri any letter, because Jafri did not receive any letter. Defendant Hieber did not produce any certified mail receipts. Defendants purposely withheld correspondence from Jafri to put her in a worse position, such that the Committee could use a lack of responsiveness as a pretense for denying Jafri admission to the New Hampshire Bar.

57. Defendant Hieber sent Jafri a copy of the letter that she claims to have sent on November 18, 2021. Defendant Hieber's letter was dated July 15, 2021. Defendant Hieber told Jafri that all Defendants refused to sign the protective order and that Jafri was responsible for prohibitively high costs of obtaining the deposition transcript, despite Jafri's financial status.

58. Defendant Hieber wrote to Jafri one final time on January 26, 2022, informing her that all Defendants would be meeting to discuss Jafri's admission on February 2, 2022.

59. Because Defendants have refused to sign the protective order, and because Jafri does not want to risk discipline or sanctions in the Trade Secret Matter, Jafri has not provided the deposition transcript to Defendants. Defendants have purposely put Jafri in this position because they wish to keep non-White and Muslim lawyers out of the New Hampshire bar.

60. Upon information and belief, Defendants treat White applicants to the New Hampshire Bar differently, and more positively, than non-White or Muslim applicants.

61. Upon information and belief, all Defendants attempted to bar non-White and Muslim applicants from being admitted to the New Hampshire Bar.

## COUNT I – DEPRIVATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983

### (Against All Defendants)

62. Plaintiff realleges and incorporates by reference paragraphs 1-59, inclusive, of this Complaint as though fully set forth herein.

63. Defendants discriminated against Plaintiff for her race and religion, while acting under color of law.

64. The Defendants' acts were objectively unreasonable, since Defendants treat White applicants to the New Hampshire Bar one way, and non-White applicants to the New Hampshire Bar in another way.

65. Defendants acted under the color of law at all times relevant, from the date Jafri applied for admission to the New Hampshire Bar, and up to the present day.

66. Defendants' deprivation of Plaintiff's rights caused Plaintiff damages.

67. Defendants acted willfully, knowing, in concert and purposefully and/or with deliberate indifference to deprive Plaintiff of her Constitutional Rights. As a result of the nature of Defendants' conduct, Plaintiff is entitled to recover punitive damages against the Defendants.

## COUNT II – VIOLATION OF DUE PROCESS

### (Against All Defendants)

68.    Plaintiff incorporates the preceding paragraphs by reference herein.

14

69.     Defendants have interfered with Plaintiff's property interests and liberty interests.

70.     Defendants' conduct, either in their individual acts or contribution to discrimination, caused Plaintiff to suffer damages and be treated differently than her White counterparts.

71.     Defendants deprived Plaintiff of Due Process rights.  Defendants neither told Jafri that she needed to prepare a presentation for her admission to the New Hampshire Bar, nor did they tell her that there would be nine attendees at the meeting with the Committee on Character and Fitness.

72.     Defendants have ignored procedural and substantive Due Process requirements in an unlawful attempt to harass Plaintiff and keep POCs out of the New Hampshire Bar.

73.     Defendants' actions intentionally and willfully deprived Plaintiff of her property interests and Plaintiff's liberty interests without due process of law and without recourse for the arbitrary, abusive, harassing and bigoted conduct of Defendants.

74.     Defendants' actions proximately caused damages to Plaintiff as previously alleged.

75.     Defendant acted willfully, knowingly and/or purposefully, and with deliberate indifference to deprive Plaintiff of her constitutional rights.  Due to the nature of Defendants' conduct, Plaintiff is entitled to recover punitive damages against Defendant.

## **JURY DEMAND**

76.     Plaintiff hereby demands trial by jury.

## **REQUEST FOR RELIEF**

Plaintiff incorporates the preceding paragraphs by reference herein.

WHEREFORE, Plaintiff seeks the following relief:

I.     Actual and compensatory damages sufficient to make her whole.

II.     Punitive damages against Defendants sufficient to punish them and deter further wrongdoing:

III.     Treble damages;

IV.     Injunctive relief sufficient to protect Plaintiff from further harassment;

V.     Attorneys' fees, litigation expenses, costs, pre- and post-judgment interest as provided by law; and

VI.     Such other and further relief as the Court deems just and proper.

Dated: 1/31/22

Respectfully Submitted,

/s/ Farva Jafri
Jafri Law Firm
50 Evergreen Row
Armonk, NY 10504
farva@jafrilawfirm.com
(800)593-7491

*Pro Se*