UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Farva Jafri

   v.         Civil No. 1:22-cv-0039-JL
              Opinion No. 2022 DNH 126

New Hampshire Supreme Court Committee
on Character and Fitness, et al.


**MEMORANDUM ORDER**

  The pro se plaintiff in this case, Farva Jafri, is a licensed attorney who alleges that the defendants, state entities and officials presiding over the New Hampshire Bar admissions process, are discriminating against her based on her race and religion and violating her rights under the Fourteenth Amendment Equal Protection and Due Process Clauses.  Jafri asserts 42 U.S.C. § 1983 claims against the New Hampshire Supreme Court Committee on Character and Fitness and the New Hampshire Supreme Court Office of Bar Admissions, as well as the general counsel of the Office of Bar Admissions in her individual and official capacities and seven members of the committee in their individual and official capacities.  Jafri requests damages and "[i]njunctive relief sufficient to protect [her] from further harassment."

  The defendants move to dismiss the case under Federal Rule of Civil Procedure 12(b)(1), arguing that the court should abstain from entertaining Jafri's lawsuit under the Younger abstention doctrine, in deference to the ongoing state bar admissions proceeding.  The defendants also assert that they are entitled to Eleventh Amendment immunity and quasi-judicial immunity.  After reviewing the parties' submissions and holding oral argument, the court grants the motion to dismiss, finding that abstention is appropriate under Younger; the claims for damages against the committee, Office of Bar Admissions, and defendants in their official capacities cannot stand

under the Eleventh Amendment; and the defendants cannot be sued for damages in their individual capacities under quasi-judicial immunity.  Having dismissed the suit, the court does not proceed to consider the defendants' additional argument that Jafri fails to state a claim upon which relief can be granted under Rule 12(b)(6).

## I.      **Applicable legal standard**

On a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1),[1] "the party invoking the jurisdiction of a federal court carries the burden of proving its existence." Murphy v. U.S., 45 F.3d 520, 522 (1st Cir. 1995).  But the court must "construe the [c]omplaint liberally and treat all well-pleaded facts as true, according the plaintiff the benefit of all reasonable inferences."  Id.  And any evidence submitted by the parties may ordinarily be considered.  See Carroll v. U.S., 661 F.3d 87, 94 (1st Cir. 2011).

## II.     **Background**

Jafri became a member of the New York Bar in 2019.  After this, she applied for admission to other state bars.  She became a member of the New Jersey Bar in 2020, the Illinois Bar in 2020, the Massachusetts Bar in 2021, and the Maine Bar in 2021.

Jafri initiated her application for admission to the New Hampshire Bar in late 2020.  In January 2021, she received an email from defendant Sherry Hieber, general counsel of the Office of Bar Admissions, notifying Jafri that she had not included a picture in her application.  Jafri

---

[1] The courts in this circuit differ as to whether Younger abstention is a ground for dismissal under Rule 12(b)(6), 12(b)(1), or neither, and the First Circuit Court of Appeals has not resolved this issue.  See Mass. Delivery Ass'n, 671 F.3d 33, 39 n.6 (1st Cir. 2012).  This court previously assessed Younger abstention under the Rule 12(b)(1) standard, and does the same here. Montgomery v. Montgomery, 764 F. Supp. 2d 328, 330 n.1 (D.N.H. 2011).

replied with two forms of photo identification--her passport and her driver's license.  In her license photograph, Jafri was wearing a hijab, a "headscarf that female adherents of the Islamic faith wear."[2]  Jafri claims that "after Jafri sent Defendant Hieber a photo of herself in the hijab, Defendant Hieber ceased communication with Jafri."[3]  Later in her complaint, however, Jafri discusses her further correspondence with Hieber, pertaining to the committee's assessment of Jafri's character and fitness.

Jafri alleges that Hieber sent her a letter in February 2021, in which Hieber "demand[ed] to know what Jafri's ties 'internationally' were."[4]  In the letter, which Jafri submitted to the court, Hieber requested information about the nature of five civil matters in which Jafri was a party, which Jafri listed in her application; the scope of the legal practice at the law firm that Jafri owns; the number of attorneys employed at Jafri's firm; and the basis for the claim on the firm's website that it "consists of internationally recognized trial lawyers, crisis managers, and strategic advisors."[5]  Jafri replied that same month.  In her letter, Jafri described the civil matters and her law firm's work, and she stated that she is "internationally recognized" because she is of Pakistani heritage and "well-known in that nation as an American lawyer and businesswoman," and she has clients in countries outside of the United States.[6]

---

[2] Compl. (doc. no. 1) at ¶ 29.

[3] Id.

[4] Id. at ¶ 31.

[5] Doc. no. 14-1 at 2.

[6] Id. at 4-5.

A couple of months later, on April 22, 2021, Jafri received a letter from Hieber via email, stating that the committee planned to interview her over a videoconferencing platform on May 4, 2021 at 10:30 a.m.  In the interview notice, Hieber wrote that "[t]he [c]ommittee wishes to discuss information related to [Jafri's] response to question 7 regarding civil litigation" to which Jafri was a party, "and any other matters related to the petition."[7]  Hieber added that the interview would "provide [Jafri] with the opportunity to present information to the committee to meet [her] burden of proving [her] good moral character and fitness pursuant to New Hampshire Supreme Court Rule 42 VI," and that the "committee's decisions are guided by the Character and Fitness standards contained in New Hampshire Supreme Court Rule 42B."[8]

Rule 42B provides, in part, that "[t]he applicant must prove his or her good moral character and fitness by clear and convincing evidence." N.H. Sup. Ct. R. 42B IV.  It also sets forth "[p]ositive characteristics to be considered" and identifies grounds for the denial of admission, including "[f]ailure to possess sufficient positive characteristics." R. 42B VI, VII. The positive characteristics include the ability to "use good judgment on behalf of clients and in conducting one's professional business; . . . avoid acts which exhibit disregard for the rights or welfare of others; . . . [and] act diligently and reliably in fulfilling one's obligations to clients, attorneys, courts, and others." R. 42B VI(3)-(5).

Hieber also stated in the interview notice that she would "communicate with [Jafri] by email to discuss the logistics of the interview."[9]  On the day of the interview, in what Jafri

---

[7] Notice of Personal Interview (doc. no. 1-1) at 7.

[8] Id.

[9] Id.

4

describes as "an obvious sign of white supremacy, hostility, and disrespect towards Jafri, an Asian and Muslim individual," Hieber sent Jafri a text message, rather than an email, in which she addressed Jafri using her first name, which she misspelled.[10]  Jafri does not detail the contents of the message.

Nine individuals were present at the interview, and "Jafri was the only [person of color] in the entire [videoconference] room."[11]  According to Jafri, she "was never notified that nine people would be attending," and she "could have obtained counsel" if she had been "provided with proper notice" of this fact.[12]

In her complaint, Jafri describes the interview and examples of the defendants' "bizarre and racist practices" and attempts to "mock[]" her and/or "embarrass and exclude Jafri from the legal profession in New Hampshire because she is Asian and Muslim."[13]  Jafri claims that one committee member, defendant Joseph McDowell, "told Jafri that she needed to give the [c]ommittee a full presentation on her character and fitness, and that it was her burden to prove to the [c]ommittee that she was fit to be admitted to the New Hampshire Bar."[14]  According to Jafri, "[n]owhere in Defendants'" interview notice "was [she] instructed to prepare a presentation."[15]  Jafri further alleges that defendant Peter Beeson said that other states "should

---

[10] Compl. (doc. no. 1) at ¶ 34.

[11] Id. at ¶ 35.

[12] Id.

[13] See, e.g., id. at ¶¶ 37, 41, 46.

[14] Id. at ¶ 37.

[15] Id. (emphasis in original).

have only given [Jafri] a conditional acceptance to practice."[16] According to the complaint, another defendant, Susan Davis, M.D., asked Jafri to read aloud before the committee Jafri's February 2021 letter, "which was already part of [her] admission application," and which described her law firm and her heritage.[17]  Jafri also alleges that Davis sought to embarrass Jafri and "wanted the entire [c]ommittee to hear that Jafri was of Pakistani descent and understand that she was . . . not 'one of them.'"[18]

As part of her presentation, Jafri discussed the civil lawsuits to which she is a party, including litigation in Illinois with her former employer.  Jafri left her former employment due to her boss's "involvement in the drug trade and the hostile work environment."[19]  Her former employer sued her for alleged breach of fiduciary duty and theft of trade secrets, and she sued the employer under the Equal Pay Act and for indemnification.  Jafri and the committee members also discussed her upcoming deposition in a lawsuit with this employer.  Jafri explained that if the committee wanted to view the deposition transcript, they "would likely first need to sign the protective order" in the case.[20]

Jafri attached the protective order to her complaint.  It provides, in pertinent part, that it applies to documents that the parties designate as confidential, and certain individuals--such as the parties, the court and its personnel, and court reporters--are permitted to view the confidential

---

[16] Id. at ¶ 41.

[17] Id. at ¶ 42.

[18] Id.

[19] Id. at ¶ 39.

[20] Id. at ¶ 43.

documents.[21]  Under the protective order, the parties' consultants and experts may review confidential information if they sign the protective order, and "others" may view confidential information "by written consent of the producing party or upon order of the Court . . . ."[22]

Following the interview, Jafri and Hieber exchanged correspondence concerning the committee's request for the deposition transcript.  First, Hieber notified Jafri that the committee required a copy of the transcript.  Then, Jafri sent Hieber a letter explaining that she could provide the transcript, but the committee members "would need to sign the protective order so that Jafri would not face sanctions or disciplinary action" from the court presiding over the matter.[23]  Jafri also explained that "purchasing a transcript would be cost-prohibitive," given her financial situation.[24]  Hieber replied that Jafri had not clarified whether the deposition was designated as confidential, and, even if it was, the protective order permitted Jafri to request consent from the court to provide the transcript to the committee.[25]  Hieber added that the committee would not assist with the fees or sign the protective order, and the committee expected Jafri to provide the transcript unless she received an order from the court prohibiting her from doing so.[26]

---

[21] See doc. no. 1-1 at 17-18.

[22] Id. at 19.

[23] Compl. (doc. no. 1) at ¶ 47.

[24] Id. at ¶ 49.

[25] See doc. no. 14-1 at 6.

[26] Compl. (doc. no. 1) at ¶ 53 (quoting doc. no. 1-1 at 46).

Jafri further alleges that the defendants' unwillingness to sign the protective order places her "in a tenuous position."  According to Jafri, she can either give the committee the transcript without permission, opening her up to discipline or sanction from the court presiding over the litigation, or she can seek permission from the court and/or opposing party, placing her "at the mercy of her former employer, . . . [who] would likely cause problems for Jafri and attempt to intervene in the New Hampshire Bar admission process."[27]  Jafri asserts that the defendants refuse "to make this process straightforward because of their ulterior motive," to exclude her from the New Hampshire Bar due to her race and religion.[28]

The committee has not yet issued a recommendation on Jafri's application.  Jafri filed the present lawsuit in January 2022.  She asserts Fourteenth Amendment due process and equal protection claims against each of the defendants under 42 U.S.C. § 1983.

## III.   Analysis

The defendants argue for dismissal on three grounds.  They assert that the court should abstain under the Younger doctrine, and that Jafri's claims against them are barred by sovereign immunity and quasi-judicial immunity.

### A.   Younger abstention

Generally, federal courts "have a 'virtually unflagging obligation . . . to exercise the jurisdiction given them.'"  Sirva Relocation, LLC v. Richie, 794 F.3d 185, 191 (1st Cir. 2015) (quoting Co. River Water Conserv. Dist. v. United States, 424 U.S. 800, 817 (1976)).  The Supreme Court has, however, "developed a small cluster of doctrines that either require or allow

---

[27] Id. at ¶ 53.

[28] Id. at ¶ 55.

federal courts to defer to state proceedings in particular circumstances," including the Younger abstention doctrine, first established in Younger v. Harris, 401 U.S. 37 (1971). Sirva Relocation, 794 F.3d at 191. The Younger doctrine "espouse[s] a strong federal policy against federal-court interference with pending state judicial proceedings absent extraordinary circumstances." Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 431 (1982). The court follows the First Circuit Court of Appeals' "three-step approach" to determine whether abstention under Younger is proper. Sirva Relocation, 794 F.3d at 192.

**_Category of ongoing state proceeding._** First, the ongoing state proceeding must belong to one of the following categories--"(i) criminal prosecutions, (ii) 'civil proceedings that are akin to criminal prosecutions,' and (iii) proceedings 'that implicate a State's interest in enforcing the orders and judgments of its courts.'" Id. (quoting Sprint Commc'ns, Inc. v. Jacobs, 571 U.S. 69, 72-73 (2013)). The Supreme Court has also described the final category as "civil proceedings involving certain orders . . . uniquely in furtherance of the state courts' ability to perform their judicial functions." Sprint, 571 U.S. at 78 (internal quotations omitted).

For this step, the court follows guidance from a Supreme Court case applying Younger to a closely related state proceeding. In Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n, the Court held that a federal court should abstain from considering a constitutional challenge to the New Jersey Bar's disciplinary rules, which were "the subject of pending state disciplinary proceedings." 457 U.S. at 425. The Court noted, among other things, that the disciplinary proceedings fall under the jurisdiction of the New Jersey Supreme Court and are carried out by local District Ethics Committees, which serve as an "arm of the court in performing its function of receiving and investigating complaints" regarding members of the bar. Id. at 432-33.

Under this reasoning, the ongoing bar admissions proceeding at the center of Jafri's complaint is also the type of proceeding that can warrant deference under Younger.  As in Middlesex, the New Hampshire Supreme Court is vested by the state legislature with "authority over the admission of a person to practice law as an attorney."  In re Unification of New Hampshire Bar, 109 N.H. 260, 263 (1968).  The New Hampshire Supreme Court, in turn, established a "board of bar examiners . . . to examine persons desiring to be admitted to the bar of New Hampshire"; a "committee on character and fitness . . . to examine the character and fitness of applicants desiring to be admitted to the bar" and to provide the New Hampshire Supreme Court with recommendations as to applicants' fitness; and an "Office of Bar Admissions . . . to administer and support the functions of the board [of bar examiners] and the committee."  N.H. Sup. Ct. R. 42 I-III.

A number of other district courts have similarly concluded that character and fitness assessments, which form a part of the state bar admissions process, trigger the Younger doctrine.  See, e.g., Otrompke v. First Dep't Comm. on Character & Fitness, 2022 WL 2704250, at *5-6 (S.D.N.Y. July 11, 2022); Mullane v. Massachusetts Bd. of Bar Examiners, 2021 WL 4132579, at *2-3 (D. Mass. Sept. 10, 2021); Grundstein v. Kasper, 2017 WL 11504217, at *3-4 (D. Vt. Dec. 20, 2017), aff'd sub nom., 748 Fed. App'x 425 (2d Cir. 2019).   Jafri cites no cases to the contrary.

***Middlesex factors.***  In the second step of the Younger analysis, the court considers whether the three additional factors discussed in Middlesex support abstention.  See Sirva Relocation, 794 F.3d at 196.  The Middlesex factors query whether the ongoing state proceeding is "judicial in nature," "implicates important state interests," and provides an adequate "opportunity to raise federal defenses."  Id.

10

To begin, the character and fitness assessment bears the markings of a judicial proceeding. It is self-evidently adjudicatory. An applicant to the New Hampshire bar is tasked to "establish[] their moral character and fitness . . . to practice law . . . by clear and convincing evidence." In re G.W., 161 N.H. 401, 402 (2011) (internal citations omitted). In reaching its determination, the committee weighs the facts and evidence against available standards of fitness, such as the "[p]ositive characteristics to be considered" and the "[g]rounds to deny admission" propounded in New Hampshire Supreme Court Rule 42B. See In re Bar Applicant ADM-2004-176, 152 N.H. 523, 536 (2005) (the Court's "finding that the applicant has not met his burden of proving his character and fitness to practice law is based primarily upon" evidence and documents, including "his filings before [a family court], his filings with the committee, his testimony before the committee and his filings with this court"); see also Lawrence v. Carlin, 541 F. Supp. 2d 189, 193 (D.D.C. 2008), aff'd, 2009 WL 1201770 (D.C. Cir. Feb. 23, 2009) (finding that the members of the District of Columbia's Committee on Admissions "perform a judicial function on behalf of the District of Columbia Court of Appeals" when "judging the fitness of applicants to practice law," in part because the "moral character and fitness evaluations involve factual investigation and the application of preexisting standards to individual circumstances.").

If the committee recommends denying admission, further proceedings, which are also judicial in nature, ensue. The committee must "promptly notify the applicant about the adverse recommendation and shall give the applicant an opportunity to appear at a hearing before it . . . to answer or explain" issues related to the committee's decision. N.H. Sup. Ct. R. 42, VI(e). At that hearing, the applicant may be represented by counsel, testimony is given under oath and recorded, and subpoenas may be issued to summon witnesses. Id. If the committee maintains its

adverse recommendation following the hearing, and the applicant does not withdraw the application, the committee sends a report and recommendation, with an explanation of the facts and reasoning underlying its decision, to the New Hampshire Supreme Court.  R. 42, VI(e)-(f). The committee's recommendations are "advisory only" and do not bind the Supreme Court or "limit[] [its] authority to take action."  In re Bar Applicant ADM-2004-176, 152 N.H. at 524 (internal citation omitted).  The Court "may grant the application [for admission] or shall require the applicant to show cause why the application should not be denied."  R. 42, VI(f).

Next, as required under Middlesex, the bar admissions proceedings also implicate important state interests.  The New Hampshire Supreme Court has expressed that the "authority to make reasonable rules for the admission and removal of members of the bar is necessarily inherent in every court, in order to enable it to discharge its duties, as much so as the power to preserve order."  In re Unification of New Hampshire Bar, 109 N.H. at 263 (quoting In re Ricker, 66 N.H. 207, 211 (1890)).  The New Hampshire Supreme Court sources its authority in this area in part from the State Constitution.  According to the Court, "the Constitution vests in the courts all the judicial power of the state. The constitutional establishment of such courts appears to carry with it the power to establish a bar to practice in them."  Id. (quoting Ricker, 66 N.H. at 210).

Finally, the New Hampshire Supreme Court offers applicants an adequate opportunity to raise federal defenses regarding the bar admissions process, including the character and fitness assessment.  Applicants may "seek review by the [New Hampshire] [S]upreme [C]ourt of the board's or subcommittee's final decision" regarding the applicant's eligibility for admission through a petition for review.  N.H. Sup. Ct. R. 42, IV(c).  In the petition, the applicant "must set forth all claims of error and reasons for challenging the board or subcommittee's determination,"

and can draw on "provisions of the constitutions, statutes, rule, regulations or other law" to construct the challenge.  Id.  This opportunity to assert "constitutional claims . . . in state-court judicial review of the administrative proceeding" is "sufficient under Middlesex."  Ohio C.R. Comm'n v. Dayton Christian Sch., Inc., 477 U.S. 619, 629 (1986).

*Exceptions to the Younger doctrine.*  The third and final step of the Younger analysis focuses on the exceptions to the doctrine, which apply in situations of "bad faith, harassment, or any other unusual circumstances that would call for equitable relief."  Bettencourt v. Bd. of Registration in Med. of Com. of Mass., 904 F.2d 772, 779 (1st Cir. 1990) (quoting Younger, 401 U.S. at 54).  "These exceptions have been very narrowly construed by the [Supreme] Court." United Books, Inc. v. Conte, 739 F.2d 30, 34 (1st Cir. 1984) (internal citations omitted); see also C. Wright, A. Miller, Federal Practice and Procedure § 4255 (3d ed.) ("There is no case since Younger was decided in which the [Supreme] Court has found that the exception for bad faith or harassment was applicable[,]" and "[l]itigants who have sought to bring themselves within the exceptions to Younger have had almost as little success in the lower courts.").

While "[t]he scope and conditions of the various Younger exceptions remain uncertain[,] . . . all that is certain is that there is some reason for interim federal-court intervention where core constitutional values are threatened during an ongoing state proceeding and there is a showing of irreparable harm that is both 'great and immediate.'"  Maymó-Meléndez v. Álvarez-Ramírez, 364 F.3d 27, 37 (1st Cir. 2004) (quoting Younger, 401 U.S. at 46).  Specifically, "only when it is crystal clear that the state tribunal either lacks the authority to proceed or can provide no meaningful relief can a party hope to demonstrate the degree of irreparable harm needed to justify federal-court intervention."  Sirva Relocation, 794 F.3d at 200 (citing New Orleans Pub. Serv., Inc. v. Council of City of New Orleans, 491 U.S. 350, 366-67 (1989)); see also Kugler v.

13

Helfant, 421 U.S. 117, 124-25 (1975) ("Only if 'extraordinary circumstances' render the state

court incapable of fairly and fully adjudicating the federal issues before it, can there be any

relaxation of the deference to be accorded to the state criminal process.").

Jafri's allegations, taken as true, do not place this case within Younger's exceptions.  See

Kugler, 421 U.S. at 126 (taking the plaintiff's allegations as true when assessing whether "the[]

facts [alleged] bring this litigation within any exception to the basic Younger rule."); see also

Torres-Negron v. J & N Recs., LLC, 504 F.3d 151, 163 (1st Cir. 2007) (noting that, in

determining whether the court has subject matter jurisdiction under Rule 12(b)(1), the court has

"substantial authority . . . to weigh the evidence and satisfy itself as to the existence of its power

to hear the case," as long as the "facts relevant to the jurisdictional inquiry" do not go to an

element of the cause of action (internal citations omitted)).  Jafri's relevant factual allegations are

either contradicted by the documents attached to her complaint or do not rise to the level of bad

faith, harassment, or unusual circumstances, as required to justify federal-court intervention.

Jafri's remaining allegations consist of her subjective perceptions of the defendants' animus, and

these are not enough, on their own, to trigger Younger's narrowly construed exceptions.  Further,

and critically, Jafri has not demonstrated that, absent federal-court intervention, she is subject to

great, immediate, and irreparable harm.

To begin, Jafri's allegation that the committee failed to instruct her to prepare a

presentation is belied by the interview notice, which Jafri attached to her complaint.  See

Yacubian v. United States, 750 F.3d 100, 108 (1st Cir. 2014) ("It is a well-settled rule that when

a written instrument contradicts allegations in the complaint to which it is attached, the exhibit

trumps the allegations" (quoting Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 229 n.1 (1st

Cir. 2013))).  The notice stated that Jafri would have "the opportunity to present information to

the committee to meet [her] burden of proving [her] good moral character and fitness[,]" and that

the committee was interested in discussing the civil litigation to which Jafri is a party and "any

other matters related to [Jafri's] petition."  The notice also referenced New Hampshire Supreme

Court Rules that reiterate the applicant's burden of proof and the standards that guide the

committee's assessment, including the list of "positive characteristics" that the committee is

tasked to consider.  In this way, Jafri was notified of the topics that could be discussed at the

interview, and that she would be presenting her case to the committee.

Jafri further alleges that the defendants failed to notify her that nine individuals would be

present at her interview, and that she "could have obtained counsel" if she had notice of this fact.

The court does not accord much weight to this omission, however, given that the notice amply

conveys that the interview is part of the committee's assessment of Jafri, and is thus of interest to

the committee as a whole.  The notice also specifically states that Jafri can be represented by

counsel at the interview.

Next, the committee's interest in Jafri's deposition transcript does not suggest bad faith or

harassment, either, as it is not inconsistent with the scope of the committee's duties.  See

Douglas v. New Hampshire Supreme Ct. Pro. Conduct Comm., 187 F.3d 621 (1st Cir. 1998)

(considering the Youngerv exceptions and finding no bad faith in the New Hampshire Supreme

Court Professional Conduct Committee's initiation of disciplinary proceedings against the

plaintiff, in part because the court "c[ould] not say" that the complaint against the plaintiff was

"patently beyond the NHPCC's jurisdiction").  Indeed, Jafri was deposed in a lawsuit in which

her former employer asserted breach of fiduciary duty and theft of trade secrets claims against

her.  This can be relevant to the "positive characteristics" that the committee considers under

Rule 42B, including, for example, the ability to "use good judgment on behalf of clients and in

conducting one's professional business; . . . avoid acts which exhibit disregard for the rights or welfare of others; . . . [and] act diligently and reliably in fulfilling one's obligations to clients, attorneys, courts, and others."  R. 42B, VI(3)-(5).

Further, the committee's refusal to sign the protective order is not so unusual, or unsupported by the terms of the protective order, as to reflect a bad faith attempt to complicate Jafri's admission process, as Jafri contends.  In particular, consistent with the defendants' position, Jafri does not allege that she provided documentation to the defendants confirming that the transcript was designated as confidential, and, even if it was, the protective order allows for parties to seek permission from the court to disclose confidential information.[29]

Similarly, Jafri's allegations regarding certain comments and requests made by the defendants do not indicate bad faith or harassment because they pertain to subject matter that is within the committee's purview.  For instance, Jafri claims that Hieber "demand[ed]" to know of Jafri's international ties in a February 2021 letter.  In that letter, which is in the record, Hieber asked Jafri questions about her law firm, including the scope of the firm's legal work, the number of employees, and the basis for the claim that the firm consists of "internally recognized trial lawyers."  Thus, Jafri's allegation is inaccurate.  She was not asked about her international ties; she was asked about information she presented on her website regarding her law firm and

---

[29] During oral argument, counsel for the defendants informed the court that, at some point after briefing was complete, they were able to obtain the deposition transcript on their own, without signing the protective order, because it was publicly available.  Jafri did not dispute this assertion.  Counsel for the defendants suggested during oral argument that the transcript's availability indicates that the defendants acted reasonably, and not with an improper motive, when refusing to sign the protective order and urging Jafri to obtain the transcript through other means.   That may be true, but regardless of this development, as explained above, the court does not draw an inference of bad faith from the committee's unwillingness to sign the protective order.

legal work, a topic that is reasonably of interest to the committee.  Other defendants' requests

that Jafri read a letter she submitted to the committee aloud and make a full presentation before

the committee do not raise alarms, as the letter was part of the record before the committee and

pertained to Jafri's law firm and legal work, and the interview notice stated that Jafri was to

present information to the committee demonstrating her character and fitness.

Jafri also describes statements or actions by the defendants which, even if not directly

related to the committee's work, are not remotely unusual or extraordinary, as needed to

overcome the "strong federal policy against federal-court interference with pending state judicial

proceedings." Middlesex, 457 U.S. at 431.  For example, one defendant's assertion that Jafri

should have been offered conditional acceptance to practice in other states, or Hieber's

misspelling of Jafri's name in a text message, may very well have offended Jafri, but they do not

evince improper motives or animus.

Alongside these factual allegations, which do not trigger Younger's exceptions, Jafri

includes a number of her own subjective perceptions and characterizations of the defendants'

conduct.  For example, at various points in the complaint, Jafri asserts that the defendants acted

so as to mock or embarrass her, or that their conduct constituted racist practices or intentional

attempts to exclude her from the New Hampshire Bar due to her race and religion.  These

subjective perceptions alone, absent factual underpinnings, cannot place this case within

Younger's narrowly construed exceptions.[30]

---

[30] In coming to this conclusion, the court need not, and does not, comment or opine on the
credibility of these subjective perceptions; it merely finds, consistent with this Circuit's
precedent, that these conclusory perceptions alone do not support a claim of wrongdoing.  See,
e.g., United States ex rel. Karvelas v. Tufts Shared Servs., Inc., 433 F. Supp. 3d 174, 179 (D.
Mass. 2019) (disregarding "bald assertions, subjective characterizations, and legal conclusions"
when determining whether the plaintiff's retaliation and wrongful termination claims against his
employer survived a motion to dismiss (quoting DM Research, Inc. v. Coll. of Am. Pathologists,

Finally, abstention is proper here since Jafri does not face a threat of "great and immediate" irreparable harm absent federal-court intervention.  Maymó-Meléndez, 364 F.3d at 37; see also Sirva Relocation, 794 F.3d at 200 ("The conclusion that no exception to the Younger doctrine applies here is reinforced by the appellants' utter failure to explain how they will be irreparably harmed by allowing the [state proceeding] to resolve this matter.").  Jafri cannot demonstrate that "the state tribunal either lacks the authority to proceed or can provide no meaningful relief" to her--as required to establish the requisite level of harm to justify federal-court intervention--for at least two reasons.  Sirva Relocation, 794 F.3d at 200.  First, as explained above, Jafri has not alleged facts demonstrating bad faith or harassment on the defendants' part, or some other bias or flaw that impedes the defendants' ability to proceed with reviewing her character and fitness.  Second, the final determination regarding Jafri's character and fitness, and her admission to the New Hampshire Bar, rests with the New Hampshire Supreme Court.  Jafri does not allege any facts suggesting that the Court is unable or without authority to consider her application for admission, meaningfully review her constitutional claims, and provide relief, if appropriate.

Indeed, if the committee issues an adverse recommendation on Jafri's application, it must submit its recommendation, along with the facts and reasoning that support it, to the New Hampshire Supreme Court, which "may [still] grant the application [for admission] or shall

---

170 F.3d 53, 55 (1st Cir. 1999))); Quiñones-Irizarry v. Corporación del Fondo del Seguro del Estado, 257 F. Supp. 3d 206, 214 (D.P.R. 2017) (finding that the plaintiff failed to state a claim of discrimination based on his political affiliation where he "relie[d] entirely on his feeling that defendants have wronged him."); Cohen v. FGX Int'l Inc., 2019 WL 2526728, at *6 n.12 (D.R.I. June 17, 2019) (the plaintiff's "allegations that male executives would use crude language or make demeaning, gender-based comments in [] meetings suffer from a reliance on characterizations rather than specific facts . . . [and] [t]hus . . . are not well-pled facts credited by the Court." (citing Dewey v. Univ. of N.H., 694 F.2d 1, 3 (1st Cir. 1982))).

require [Jafri] to show cause why the application should not be denied." N.H. Sup. Ct. R. 42, VI(f). Jafri can raise her Fourteenth Amendment claims before the New Hampshire Supreme Court at that time and in a petition for review. And, importantly, the New Hampshire Supreme Court is "as capable as [its] federal counterparts of guaranteeing federal rights." Bettencourt, 904 F.2d at 776 (citing Middlesex, 457 U.S. at 431).

The three-step analysis confirms that the Younger doctrine applies. Accordingly, the court must "dismiss[] . . . [the] plaintiff's claims for injunctive and declaratory relief." Id. at 781. Federal courts are normally directed to "stay rather than dismiss [a] plaintiff's claims for monetary relief" under Younger, in order to avoid the risk that the statute of limitations may run on the plaintiff's claims for damages while the state proceedings continue. Id. Here, the court will dismiss, rather than stay, the damages claims against each of the defendants because, as discussed next, two immunity doctrines bar these claims--state sovereign immunity under the Eleventh Amendment and quasi-judicial immunity.

### B.    Eleventh Amendment immunity

"The Supreme Court has clearly said that the Eleventh Amendment bars federal suits by citizens against the state or state agencies . . . ." O'Neill v. Baker, 210 F.3d 41, 47 (1st Cir. 2000). Therefore, "[u]nless a State has waived its Eleventh Amendment immunity or Congress has overridden it, . . . a State cannot be sued directly in its own name regardless of the relief sought." Brait Builders Corp. v. Massachusetts, Div. of Cap. Asset Mgmt., 644 F.3d 5, 11 (1st Cir. 2011) (quoting Kentucky v. Graham, 473 U.S. 159, 167 n.14 (1985)). Eleventh Amendment immunity also extends to "a suit against a state official in his or her official capacity," as that "is a suit against the official's office" and thus "no different from a suit against the State itself." Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989) (internal citations omitted).

Importantly, "Congress, in passing § 1983, had no intention to disturb the States' Eleventh Amendment immunity."  Id. at 66.

It follows that the Eleventh Amendment bars Jafri's § 1983 claims for damages against the Bar Admissions Office and committee, as well as her damages suit against the individual defendants in their official capacities   Both the Bar Admissions Office and the committee are agencies acting under the State's control.  See Sinapi v. Rhode Island Bd. of Bar Examiners, 910 F.3d 544, 553 (1st Cir. 2018) (ruling that the Rhode Island Board of Bar Examiners, "including its members in their official capacities, stands in the shoes of Rhode Island itself, as an arm of the state." (quoting In re Petition of DeOrsey, 312 A.2d 720, 724 (1973))).  And Jafri does not argue (nor does the court find) that the State has waived its immunity to this type of § 1983 suit. See Davidson v. Howe, 749 F.3d 21, 28 (1st Cir. 2014) ("This court 'will find waiver only where stated by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.'" (quoting Edelman v. Jordan, 415 U.S. 651, 673 (1974))).

Jafri seeks to avoid this outcome by arguing that immunity is an affirmative defense, not a matter of subject matter jurisdiction, so the court should not dismiss the case on this basis prior to discovery.  Even assuming that a finding of sovereign immunity did not strip this court of subject matter jurisdiction, however, the court finds no reason to delay consideration of Eleventh Amendment immunity.  Federal courts may "defer thorny Eleventh Amendment questions in cases in which it is perfectly clear that the state entity will prevail on the merits."  Brait Builders Corp., 644 F.3d at 11.  But courts also may elect "not [to] bypass the Eleventh Amendment question" where "the answer to that question is quite straightforward."  Id. at 11-12 (directing the district court to dismiss a private plaintiff's § 1983 suit against a Massachusetts state agency for

alleged due process violations, based on state sovereign immunity). The Eleventh Amendment issue here is not complicated, so the court will not bypass it.

Jafri also argues that Eleventh Amendment immunity does not apply here, as "[n]o immunity protects states from a claim for monetary damages based on 'actual violations' of the Fourteenth Amendment." Sinapi, 910 F.3d at 553 (emphasis in original) (quoting United States v. Georgia, 546 U.S. 151, 158 (2006)). This bar to immunity only applies, however, where the plaintiff "allege[s] sufficient facts to make out . . . an 'actual' violation of the Fourteenth Amendment." Id. Jafri has not alleged facts stating her equal protection and due process claims.

To begin, in order to state a claim under the Equal Protection Clause of the Fourteenth Amendment, Jafri must "allege facts indicating that, compared with others similarly situated, [she] was selectively treated . . . based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Barrington Cove Ltd. P'ship v. R.I. Hous. & Mortg. Fin. Corp., 246 F.3d 1, 7 (1st Cir. 2001) (internal quotation omitted); see also Ayala-Sepúlveda v. Municipality of San Germán, 671 F.3d 24, 32 (1st Cir. 2012) ("[s]ome evidence of actual disparate treatment is a threshold requirement of a valid equal protection claim."). Jafri does not allege facts indicating that similarly situated individuals were treated differently than her. Her conclusory statement that "Defendants treat White applicants to the New Hampshire Bar differently, and more positively, than non-White or Muslim applicants" does not constitute a factual allegation that can support her claim.[31] See Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (noting that, in determining if a plaintiff has stated a plausible claim for relief, courts

---

[31] Compl. (doc. no. 1) at ¶ 64.

should "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements." (internal citation omitted)).

Further, as described above, see supra Section III.A, Jafri's allegations of discrimination are conclusory, subjective, and/or contradicted by the documents in the record, and thus do not support an inference that the defendants treated her differently based on her race or religion, as Jafri contends.  See, e.g., Hoffman v. City of Warwick, 909 F.2d 608, 624 (1st Cir. 1990) (an "equal protection violation is not established 'by the opprobrious epithets 'willful' and 'malicious' applied to the state's action, or by characterizing that action as an unequal, unjust, and oppressive administration of [state law]'" (quoting Snowden v. Hughes, 321 U.S. 1, 10 (1944))); Charette v. St. John Valley Soil & Water Conservation Dist., 2017 WL 2683951, at *15 (D. Me. June 20, 2017) ("a plaintiff asserting an Equal Protection claim cannot 'rest on subjective characterizations or conclusory descriptions of a general scenario which could be dominated by unpleaded facts.'" (emphasis in original) (quoting Coyne v. City of Somerville, 972 F.2d 440, 444 (1st Cir. 1992))).

Jafri also fails to state a substantive due process claim under the Fourteenth Amendment. "Where, as here, a plaintiff's substantive due process claim challenges the specific acts of a state officer, the plaintiff must show both that the acts were so egregious as to shock the conscience and that they deprived [her] of a protected interest in life, liberty, or property." Pagán v. Calderón, 448 F.3d 16, 32 (1st Cir. 2006) (citing Rivera v. Rhode Island, 402 F.3d 27, 34 (1st Cir. 2005)).  "In determining whether the state has violated an individual's substantive due process rights, a federal court may elect first to address whether the governmental action at issue is sufficiently conscience-shocking." Rivera, 402 F.3d at 36.  To qualify as conscience-shocking, "conduct must at the very least be extreme and egregious or, put another way, truly

outrageous, uncivilized, and intolerable." Pagán, 448 F.3d at 32 (internal quotations omitted).

For the same reasons that the court finds no bad faith or harassment, see supra Section III.A, the

court also finds that Jafri fails to allege facts that rise to the level of conscience-shocking

behavior.  See Quarterman v. City of Springfield, 716 F. Supp. 2d 67, 74 (D. Mass. 2009)

(allegations that the defendant made "several inappropriate and racially discriminatory comments

. . . do not enhance the record sufficiently to support a substantive due process claim," as "the

alleged conduct is insufficiently egregious"); MacFarlane v. Town of E. Bridgewater, 110 F.

Supp. 3d 310, 326 (D. Mass. 2015) (the plaintiffs' characterizations of the actions of the

defendants, police officers, as "intimidating,  harassing, threatening, embarrassing, and

humiliating," without supporting factual allegations, were "conclusory" and did not state a

substantive due process claim).

Turning to Jafri's final constitutional claim, "[p]rocedural due process guarantees an

affected individual the right to some form of hearing, with notice and an opportunity to be heard,

before [s]he is divested of [her] protected interest." Cotnoir v. Univ. of Maine Sys., 35 F.3d 6,

10 (1st Cir. 1994) (internal citation omitted).  "[T]he general rule is that due process requires[]

'notice reasonably calculated, under all the circumstances, to apprise interested parties of the

pendency of the action and afford them an opportunity to present their objections.'" In re Arch

Wireless, Inc., 534 F.3d 76, 83 (1st Cir. 2008) (quoting Mullane v. Cent. Hanover Bank & Tr.

Co., 339 U.S. 306, 314 (1950)).  More specifically, "[t]he notice must be of such nature as

reasonably to convey the required information, and it must afford a reasonable time for those

interested to make their appearance." Id.

Jafri does not allege any facts supporting a procedural due process violation.  The

defendants notified Jafri of her interview more than ten days before it took place.  Jafri does not

contend that this is insufficient, nor can she.  More than ten days of notice is adequate, given that the focus of the interview was civil litigation to which Jafri was a party and other aspects of Jafri's application to the committee--information with which Jafri was familiar, as she provided it to the committee.  Further, the interview notice more than adequately conveyed information Jafri needed to be present and prepare for the interview.  The notice included the time, date, and venue of the interview; the purpose of the interview--to give Jafri an opportunity to meet her burden of proving good moral character and fitness; and a reference to New Hampshire Supreme Court Rules that establish her burden of proof and set out the characteristics considered when determining applicants' character and fitness.

In sum, Eleventh Amendment immunity is applicable here, and is not barred by an alleged, actual violation of the Fourteenth Amendment.  Jafri's claims seeking monetary damages against the Office of Bar Admissions and the committee, as well as the individual defendants in their official capacities, are accordingly dismissed.

### C.        Quasi-judicial immunity

Jafri's remaining claims, which seek damages against Hieber and the committee members in their individual capacities, are barred by quasi-judicial immunity.  The doctrine of judicial immunity shields "judges from liability for damages for acts committed within their judicial jurisdiction."  Cleavinger v. Saxner, 474 U.S. 193, 199 (1985).  "[T]he [Supreme] Court has extended absolute immunity to certain others who perform functions closely associated with the judicial process," following a "functional approach," under which immunity attaches based on the "nature of the responsibilities of the individual official."  Id. at 200-01.

The First Circuit Court of Appeals sets forth three questions to determine "how closely analogous the adjudicatory experience of [an official] is to that of a judge." Bettencourt, 904 F.2d at 783.

> First, does [the official], like a judge, perform a traditional 'adjudicatory' function, in that he decides facts, applies law, and otherwise resolves disputes on the merits (free from direct political influence)? Second, does [the official], like a judge, decide cases sufficiently controversial that, in the absence of absolute immunity, he would be subject to numerous damages actions? Third, does [the official], like a judge, adjudicate disputes against a backdrop of multiple safeguards designed to protect [the subject's] constitutional rights?

Id. (internal citations omitted).

The answer to each of these questions is "yes." As described supra Section III.A, the defendants perform an adjudicatory function with respect to the bar admissions process, by reviewing evidence (in this case, of the applicant's character and fitness to practice law), and comparing the evidence to applicable standards. The defendants could be subject to damages actions based on their decisions, since their determinations impact an applicant's ability to practice law, and thereby earn an income and/or pursue career opportunities, in New Hampshire. Finally, the bar admissions process provides safeguards, including an opportunity for a hearing before the committee prior to the issuance of an adverse recommendation and an avenue to seek review and raise constitutional claims before the New Hampshire Supreme Court.

In finding that Hieber and the members of the committee are entitled to quasi-judicial immunity in this case, the court follows binding precedent from the First Circuit Court of Appeals, in which quasi-judicial immunity was applied to members of professional boards carrying out functions related to the discipline, admission, and removal of members from the practice of the profession in their states. See Sinapi, 910 F.3d at 554-55 (concluding that "it is manifest that the [Rhode Island] Board [of Bar Examiners] members enjoy quasi-judicial

immunity" in adjudicating exam takers' requests for accommodation); Bettencourt, 904 F.2d at

783-84 (ruling that quasi-judicial immunity attaches to members of the Massachusetts Board of

Registration in Medicine with respect to their adjudicatory role in disciplinary proceedings);

Coggeshall v. Massachusetts Bd. of Registration of Psychologists, 604 F.3d 658, 663 (1st Cir.

2010) (citing Bettencourt and holding that members of the Massachusetts Board of Registration

of Psychologists are entitled to quasi-judicial immunity for their adjudicatory role in disciplinary

proceedings).

## IV.    **Conclusion**

For the reasons set forth above, the defendants' motion to dismiss[32] is GRANTED.

Jafri's claim for injunctive relief is dismissed without prejudice under Younger abstention

doctrine; her claims for damages against the Office of Bar Admissions, the committee, and the

individual defendants in their official capacities are dismissed with prejudice under Eleventh

Amendment state sovereign immunity; and her claims for damages against the defendants in

their individual capacities are dismissed with prejudice under quasi-judicial immunity.  The clerk

shall enter judgment accordingly and close the case.

> **SO ORDERED.**
>
> _____
> Joseph N. Laplante
> United States District Judge

Dated: October 18, 2022

cc:    Kevin A. Brooks, Esq.
       Farva Jafri, Esq.

---

[32] Doc. no. 5.

26